**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Martha Strother Smith, | : | Case No. 1:12 CV 2042 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| | : | **RECOMMENDATION** |
| Defendant, | : | |

## I. INTRODUCTION

Plaintiff Martha Strother Smith ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. §

405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying

her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C.

§§ 416(i), and 423 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 13 and

14) and Plaintiff's Reply (Docket No. 15). For the reasons that follow, the Magistrate recommends that

the decision of the Commissioner be affirmed.

## II. PROCEDURAL BACKGROUND

1

On September 13, 2007, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 11, p. 115 of 601).[1] In her application, Plaintiff alleged a period of disability beginning June 1, 2006 (Docket No. 11, p. 115 of 601). Plaintiff's claim was denied initially on November 26, 2007 (Docket No. 11, p. 80 of 601), and upon reconsideration on January 29, 2008 (Docket No. 11, p. 89 of 601). Plaintiff thereafter filed a timely written request for a hearing on February 27, 2008 (Docket No. 11, p.  96 of 601).

On March 11, 2010, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Traci M. Hixson ("ALJ Hixson") (Docket No. 11, pp. 28-60 of 601). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 11, pp. 50-60 of 601). ALJ Hixson found Plaintiff to have a severe combination of status/post right acetabular fracture (hip fracture), status/post right ankle fracture, seizure disorder, and degenerative disc disease of the lumbar spine with an onset date of June 1, 2006 (Docket No. 11, p. 17 of 601).

Despite these limitations, ALJ Hixson determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of her decision, April 13, 2010 (Docket No. 11, p. 22 of 601). ALJ Hixson found Plaintiff had the residual functional capacity to perform light work with the following limitations:

1.      Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently

2.      Plaintiff can stand and walk for six hours during a typical eight-hour workday

3.      Plaintiff can sit for six hours during a typical eight-hour workday

---

[1] Plaintiff previously applied for both DIB and Supplemental Security Income ("SSI") on November 30, 2004, alleging a disability onset date of June 30, 2004 (Docket No. 11, pp. 107, 112 of 601). Plaintiff's claims were denied initially on February 2, 2005 (Docket No. 11, p. 66 of 601), and upon reconsideration on February 15, 2005 (Docket No. 11, pp. 69-70 of 601).

4.    Plaintiff must have a sit/stand option every hour

5.    Plaintiff can occasionally climb stairs and ramps with handrails

6.    Plaintiff can bend, balance, stoop, reach in all directions, handle, finger, and feel

7.    Plaintiff cannot kneel or crawl

8.    Plaintiff must avoid vibration and hazardous conditions

(Docket No. 11, p. 18 of 601). Plaintiff's request for benefits was therefore denied (Docket No. 11, p. 22 of 601).

On August 7, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of her denial of DIB (Docket No. 1). In her pleading, Plaintiff alleged that the ALJ failed to: (1) reasonably assess Plaintiff's credibility; and (2) pose a reasonable hypothetical question to the VE (Docket No. 13). Defendant filed its Answer on November 2, 2012 (Docket No. 14).

### III.  FACTUAL BACKGROUND

#### A.    ADMINISTRATIVE HEARING

An administrative hearing convened on March 11, 2010, in Cleveland, Ohio (Docket No. 11, pp. 28-60 of 601). Plaintiff, represented by counsel Lawrence Friedlander, appeared and testified (Docket No. 11, pp. 32-50 of 601). Also present and testifying was VE Brett Salkin (Docket No. 11, pp. 50-60 of 601).

#### 1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a fifty-three-year-old female who was separated from her husband (Docket No. 11, p. 32 of 601). Plaintiff has two grown children, ages thirty-four and thirty-seven, and four grandchildren (Docket No. 11, pp. 32, 35 of 601). Plaintiff testified that she

3

resided with another individual (Docket No. 11, p. 32 of 601). Plaintiff testified that she completed eleventh grade but never earned her GED (Docket No. 11, pp. 32-33 of 601). Plaintiff also indicated that she has a valid driver's license, but, at the time of the hearing, had not driven in about a year (Docket No. 11, p. 32 of 601). When asked what prevented her from working, Plaintiff indicated that she experienced numbness in her right foot (Docket No. 11, p. 40 of 601).

With regard to her past employment, Plaintiff stated that she last worked as a full-time cashier at Tops Market in 2006, a position she held for eleven or twelve years (Docket No. 11, p. 37 of 601). Plaintiff testified that she occasionally had to bag groceries and carry them to the customers' cars (Docket No. 11, p. 37 of 601). Plaintiff indicated that she was lifting heavy things "most of the time" (Docket No. 11, p. 38 of 601). Plaintiff was terminated from this job (Docket No. 11, p. 38 of 601). Simultaneous to this cashier position, Plaintiff worked for the City of Cleveland Heights as a fry cook/assistant cook manager in the school system (Docket No. 11, pp. 38-39 of 601). She held this position for fourteen years, but eventually left because the pay was better at Tops Market (Docket No. 11, p. 39 of 601).

Plaintiff gave testimony concerning a number of her alleged impairments, including right hip pain, right leg pain, seizures, acid reflux, sleep apnea, back pain, and a goiter (Docket No. 11, pp. 40-48 of 601). Plaintiff indicated that she broke her ankle and still experiences pain and swelling in her right leg (Docket No. 11, p. 43 of 601). She wears support hose and elevates her leg during the day (Docket No. 11, pp. 43, 45 of 601). Plaintiff later indicated that she experiences swelling in both legs (Docket No. 11, p. 48 of 601). Plaintiff testified that she experiences pain in her right hip, which she also broke (Docket No. 11, p. 40 of 601). She indicated that she cannot go up or down stairs without using the railing, and stated that she has to lead with the same foot every time and take stairs one stair

4

at a time (Docket No. 11, pp. 40-41 of 601).

With regard to her seizures, Plaintiff testified that she has seizures periodically, usually once every two to three months (Docket No. 11, p. 41 of 601). Plaintiff indicated that she can feel the seizures coming on when she is awake, but stated that the seizures often occur during her sleep (Docket No. 11, p. 41 of 601). Plaintiff testified that she does not remember what happens during these nighttime seizures, but she can wake up and know that she has had one (Docket No. 11, p. 41 of 601). Plaintiff indicated that her last seizure occurred a couple of months prior to the hearing (Docket No. 11, p. 42 of 601).

Plaintiff stated that she also suffers from back pain and muscle spasms (Docket No. 11, p. 43 of 601). She claimed that the pain is so intense she cannot stand up straight some mornings (Docket No. 11, p. 43 of 601). Plaintiff indicated that she has a touch of arthritis and is in constant pain (Docket No. 11, p. 48 of 601). Plaintiff also testified that she suffers from acid reflux, for which she takes prescription medication (Docket No. 11, p. 43 of 601), sleep apnea, for which she uses a continuous positive airway pressure ("CPAP") machine (Docket No. 11, p. 43 of 601), and has plans to have a goiter surgically removed (Docket No. 11, p. 44 of 601).

### 2.  VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a cashier as medium and unskilled as performed, and her past work as a cook as medium and unskilled (Docket No. 11, pp. 52-53 of 601).

ALJ Hixson then posed her first hypothetical question:

Assuming we had a person of the same age, education, and employment background as [Plaintiff] and this person is able to . . . lift and carry [twenty] pounds occasionally, [ten] pounds frequently. This person is standing and walking for six hours and sitting for six hours, but we're going to let them have a sit/stand option every hour. This person is

5

occasionally climbing stairs and ramps with handrails, occasionally bending and balancing and stooping. This person is not kneeling or crawling. This person is reaching in all directions. This person can handle, finger, and feel. We're not going to expose this person to vibration or hazardous conditions. Would this person be able to return to [Plaintiff's] past work?

(Docket No. 11, pp. 54-55 of 601). Taking into account these limitations, the VE testified that such an individual would not be able to return to Plaintiff's past work (Docket No. 11, p. 55 of 601). The VE stated that there was other work that such an individual could perform, including: (1) watch guard, listed under Dictionary of Occupational Titles ("DOT") Number 372.667-010, for which there are 212,000 positions nationally and 1,393 locally; (2) vending attendant, listed under DOT 319.464-014, for which there are 79,000 positions nationally and 668 locally; and (3) office helper, listed under DOT 209.587-026, for which there are 918,000 positions nationally and 7,100 locally (Docket No. 11, p. 55 of 601).

ALJ Hixson then amended her hypothetical, stating, "instead of a sit/stand option this person needs to elevate their leg . . . we'll say below waist level, so when they're seated they need to elevate that leg – would that change the availability of these positions" (Docket No. 11, p. 55 of 601). VE Salkin indicated that the other work possibilities would remain unchanged (Docket No. 11, p. 56 of 601). The ALJ then questioned whether "if a person were only lifting and carrying [ten] pounds occasionally and only standing and walking for two hours and sitting for six, would that be considered a sedentary position?" (Docket No. 11, p. 56 of 601). The VE responded in the affirmative (Docket No. 11, p. 56 of 601).

During cross-examination, Plaintiff's counsel expanded upon the ALJ's hypothetical, adding, "if you introduced into the hypothetical that the hypothetical person had sleep apnea with bots [sic] of falling asleep during the day and restlessness at night, would that change the availability of the [watch

guard] occupation?" (Docket No. 11, p. 56 of 601). VE Salkin indicated that, with that limitation, the hypothetical person could not perform the watch guard job (Docket No. 11, p. 57 of 601).

Plaintiff's counsel went on to ask if, "in the vending attendant and the office helper job . . . even though it's a light job, does that involve flexibility in terms of bending down and picking up items and putting them into racks or filing items in file folders and file cabinets and things of that nature?" (Docket No. 11, p. 57 of 601). The VE indicated that no more than one-third of the day is spent bending in these two positions as they are customarily performed (Docket No. 11, p. 58 of 601).


## C.  MEDICAL RECORDS

### 1.  PHYSICAL IMPAIRMENTS

Plaintiff's medical records date back to July 2, 2004, when Plaintiff was admitted to MetroHealth Medical Center ("MetroHealth") following a car accident during which she sustained a right superior posterior wall acetabular fracture (Docket No. 11, p. 193 of 601). Plaintiff immediately underwent surgery for an open reduction and internal fixation of the fracture (Docket No. 11, p. 193 of 601). During her stay, hospital staff noted that Plaintiff had impaired mobility and activities of daily living (Docket No. 11, p. 199 of 601). Plaintiff was therefore admitted to the hospital for further comprehensive rehabilitation (Docket No. 11, p. 199 of 601). During an evaluation, it was noted that Plaintiff suffered from a seizure disorder and was morbidly obese (Docket No. 11, p. 201 of 601).

On December 7, 2004, Plaintiff saw Dr. Robert F. Richardson, MD ("Dr. Richardson") who diagnosed Plaintiff with probable idiopathic complex partial seizures which were controlled on phenytoin (Docket No. 11, p. 275 of 601). Dr. Richardson confirmed this diagnosis on May 4, 2005 (Docket No. 11, p. 273 of 601). Plaintiff saw Dr. Richardson on November 28, 2005, and June 5, 2006,

7

for follow-up examinations (Docket No. 11, pp. 271-72 of 601).

On May 23, 2005, Plaintiff was seen by staff at MetroHealth's Department of Physical Medicine and Rehabilitation (Docket No. 11, p. 208 of 601). Plaintiff complained of localized pain in her lumbar and right hip region, rating the pain at a level five out of a possible ten (Docket No. 11, p. 208 of 601). Plaintiff described the pain as dull, burning, and intense with radiation to her right knee (Docket No. 11, p. 208 of 601). Plaintiff underwent an MRI on her lumbar region which revealed degenerative disc disease at the L3-4 and L4-5 vertebrae, resulting in mild central canal and foraminal encroachment (Docket No. 11, p. 208 of 601). Staff indicated that Plaintiff's was a complex case with most of her pain likely from her lower back, although radiculitis could not be officially ruled out (Docket No. 11, p. 209 of 601). Plaintiff was advised to return to work part-time, if allowed (Docket No. 11, p. 209 of 601).

On March 8, 2007, Plaintiff presented in the MetroHealth Emergency Room ("MetroHealth ER") complaining of right ankle pain after slipping and falling on ice (Docket No. 11, p. 215 of 601). Following an x-ray, it was determined that Plaintiff suffered from non-displaced distal fibular and medial malleolar fractures (Docket No. 11, p. 217 of 601). Plaintiff's ankle was splinted (Docket No. 11, p. 216 of 601). One week later, on March 16, 2007, Plaintiff underwent surgery to correct this ankle fracture (Docket No. 11, p. 218 of 601).

On April 4, 2007, Plaintiff reported to MetroHealth claiming to have had a seizure one to two nights earlier because she had missed a dose of medication (Docket No. 11, p. 222 of 601). Plaintiff stated that, before this incident, it had been one year since her last seizure (Docket No. 11, p. 222 of 601).

By May 2, 2007, Plaintiff's ankle x-rays were clear and there was no evidence of any

remaining fracture lines (Docket No. 11, p. 303 of 601). Plaintiff was released to return to sit-down work, and was told that she could stand as tolerated, but was instructed to sit down if her ankle became sore (Docket No. 11, p. 303 of 601). On May 18, 2007, Plaintiff presented to the MetroHealth ER with discoloration, swelling, and pain of her right ankle radiating into her calf (Docket No. 11, p. 306 of 601). Plaintiff was still able to bear weight on that ankle (Docket No. 11, p. 306 of 601). Radiology scans showed soft tissue swelling of the ankle, but no acute fracture (Docket No. 11, p. 231 of 601). On June 6, 2007, Plaintiff reported to MetroHealth staff that her right ankle had been swollen for the past week (Docket No. 11, p. 232 of 601). Plaintiff stated that her pain was at a level five out of possible ten (Docket No. 11, p. 232 of 601). She was referred to the emergency room for a lower extremity doppler scan to rule out deep vein thrombosis ("DVT") (Docket No. 11, p. 233 of 601). The scan was normal (Docket No. 11, p. 191 of 601).

On June 13, 2007, Plaintiff returned to MetroHealth complaining of right ankle pain and swelling (Docket No. 11, p. 244 of 601). There was also serous drainage from Plaintiff's surgical incision (Docket No. 11, p. 244 of 601). Plaintiff was advised to elevate her right leg and wear compression stockings (Docket No. 11, p. 244 of 601). Plaintiff presented to MetroHealth on August 15, 2007, and September 19, 2007, still complaining of pain and swelling of her right ankle (Docket No. 11, pp. 246, 260 of 601). An examination was normal and Plaintiff was advised to elevate her right leg and wear compression stockings (Docket No. 11, pp. 246, 260 of 601).

On September 12, 2007, while waiting in the MetroHealth Orthopedic Clinic, Plaintiff had a seizure (Docket No. 11, p. 248 of 601). Plaintiff was transferred to the MetroHealth ER (Docket No. 11, p. 248 of 601). She left against medical advice, choosing not to wait for test results, claiming that she had been waiting in the ER for too long (Docket No. 11, p. 256 of 601).

9

On October 1, 2007, Plaintiff saw Dr. Anil Kumar Vijayan ("Dr. Vijayan") in an attempt to establish a relationship with a primary care physician (Docket No. 11, p. 262 of 601). Plaintiff complained of persistent right leg swelling with ankle pain which worsened throughout the day (Docket No. 11, p. 265 of 601). Plaintiff also mentioned having difficulties with snoring, although she denied any daytime sleepiness (Docket No. 11, p. 262 of 601). Plaintiff was referred for a polysomnogram (sleep study) (Docket No. 11, p. 265 of 601).

On October 31, 2007, Plaintiff saw registered nurse Valerie Ross ("Ms. Ross") for a pre-evaluation to her sleep study (Docket No. 11, p. 338 of 601). Plaintiff complained of snoring, excessive daytime sleepiness, unrefreshed sleep, difficulty falling asleep, and difficulty maintaining sleep (Docket No. 11, p. 338 of 601). Plaintiff was preliminarily diagnosed with obstructive sleep apnea ("OSA") and instructed on methods to improve her sleep as well as the effects that her weight may be having on her sleep (Docket No. 11, p. 340 of 601). Plaintiff underwent a sleep study on November 7, 2007 (Docket No. 11, p. 342 of 601). No therapeutic intervention was performed during this study, as Plaintiff did not meet the protocol for CPAP treatment (Docket No. 11, p. 343 of 601). The study revealed that Plaintiff had mild OSA and treatment was recommended (Docket No. 11, p. 343 of 601).

On December 22, 2007, Plaintiff again presented to MetroHealth complaining of right leg swelling (Docket No. 11, p. 345 of 601). Plaintiff was diagnosed with edema[2] in her legs (Docket No. 11, p. 346 of 601).

Plaintiff underwent a second sleep study on January 8, 2008 (Docket No. 11, p. 350 of 601).

_____

[2] A local or generalized condition in which body tissues contain an excessive amount of tissue fluid in the interstitial spaces. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

This time, Plaintiff was given CPAP treatment, which was successful at twelve cm H20 (Docket No. 11, p. 350 of 601).

Plaintiff returned to Dr. Vijayan on April 13, 2008, for a routine medical follow-up appointment (Docket No. 11, p. 380 of 601). Plaintiff stated that she still had some "occasional discomfort" in her right leg (Docket No. 11, p. 380 of 601). On November 10, 2008, Plaintiff presented to MetroHealth complaining of fluid retention mainly affecting her right leg, but also her left (Docket No. 11, p. 414 of 601). Plaintiff claimed that the swelling had gotten worse over the past five months, and she was also experiencing numbness in her right big toe (Docket No. 11, p. 414 of 601). Plaintiff was referred to physical therapy and a weight management clinic (Docket No. 11, p. 414 of 601).

On November 14, 2008, Plaintiff presented to the MetroHealth ER for back pain that had persisted for three days (Docket No. 11, p. 423 of 601). Plaintiff denied any fall or injury precipitating the pain and also denied any radiating pain (Docket No. 11, p. 423 of 601), although later stated that she lifted a cooler filled with ice immediately before the back pain began (Docket No. 11, p. 440 of 601). An MRI showed advanced degenerative disc disease at the L4-5 vertebrae, mild superior endplate deformities, and marrow edema involving the superior endplates of the T12 through L3 vertebrae (Docket No. 11, p. 500 of 601). Plaintiff was diagnosed with chronic lumbar back strain (Docket No. 11, p. 435 of 601). Plaintiff reported to a MetroHealth immediate care facility on November 19, 2008, complaining of back pain (Docket No. 11, p. 440 of 601). She was again diagnosed with a back strain (Docket No. 11, p. 441 of 601). Plaintiff attended a physical therapy session on December 5, 2008 (Docket No. 11, p. 448 of 601). Plaintiff indicated that she had just begun wearing compression stockings on both legs three weeks prior to the visit (Docket No. 11, p. 448 of 601). Plaintiff stated that she had no pain (Docket No. 11, p. 448 of 601).

11

On January 5, 2009, Plaintiff saw Dr. Michael F. Bahntge ("Dr. Bahntge") complaining of seizures (Docket No. 11, p. 453 of 601). Dr. Bahntge noted that Plaintiff had difficulty with a tandem gait, and expressed concern about the level of medication Plaintiff was taking (Docket No. 11, p. 453 of 601).

On January 30, 2009, Plaintiff presented to MetroHealth complaining of right ankle pain and swelling (Docket No. 11, p. 466 of 601). Plaintiff claimed to be doing her home exercises and wearing the compression stockings (Docket No. 11, p. 466 of 601). Plaintiff was diagnosed with edema, primarily due to venous stasis[3] (Docket No. 11, p. 468 of 601). On February 27, 2009, Plaintiff again presented to MetroHealth, this time complaining of back pain (Docket No. 11, p. 470 of 601). She claimed the pain was worse upon bending and stated that she found it difficult to get out of bed in the morning (Docket No. 11, p. 470 of 601). Plaintiff was diagnosed with degenerative disc disease and referred to physical therapy (Docket No. 11, p. 470 of 601). Plaintiff returned to MetroHealth on June 1, 2009, complaining of lower back pain which had gotten worse in the past two weeks (Docket No. 11, p. 515 of 601). Staff recommended medication and physical therapy (Docket No. 11, p. 515 of 601).

On January 23, 2010, Plaintiff saw Dr. Vijayan complaining of increased swelling on the left side of her neck (Docket No. 11, p. 565 of 601). She complained of shortness of breath during the past few months accompanied by an early morning cough and sputum (Docket No. 11, p. 565 of 601). Plaintiff was sent for a scan of her neck (Docket No. 11, p. 567 of 601).

---

[3] An impairment or stoppage of the flow of blood through the veins (or a vein). A stagnation of the blood in the veins. ATTORNEYS' DICTIONARY OF MEDICINE, V-122814 (2009).

C.    **EVALUATIONS**

1.    **BUREAU OF DISABILITY DETERMINATION EVALUATION**

On November 13, 2007, Dr. Richardson completed a survey at the request of the Bureau of

Disability Determination ("BDD") (Docket No. 11, pp. 269-70 of 601). Dr. Richardson indicated that

Plaintiff suffered from partial complex seizures but reported that, if Plaintiff was compliant with her

medication routine, she had no seizures (Docket No. 11, pp. 269-70 of 601). Dr. Richardson opined

that Plaintiff had no limitations (Docket No. 11, p. 270 of 601).

2.    **PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT**

On November 14, 2007, Plaintiff underwent a Physical Residual Functional Capacity

Assessment with state examiner Dr. James Gahman, MD ("Dr. Gahman") (Docket No. 11, pp. 277-80

of 601). Dr. Gahman determined that Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2)

frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for a total of six hours during an

eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; (5) engage in

unlimited pushing and pulling; and (6) occasionally kneel (Docket No. 11, pp. 277-78 of 601). Dr.

Gahman also determined that Plaintiff could never climb ladders, ropes or scaffolds, or balance

(Docket No. 11, p. 278 of 601). Plaintiff should avoid even moderate exposure to hazards like

machinery and heights (Docket No. 11, p. 280 of 601). Plaintiff had no manipulative, visual, or

communicative limitations (Docket No. 11, pp. 279-80 of 601).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are

identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v.*

*Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a

"disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI

claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time

he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th

Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do

basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to

be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment

meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual

functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity

is an administrative "assessment of [the claimant's] physical and mental work abilities – what the

individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS

126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum*

remaining ability to do sustained work activities in an ordinary work setting on a **regular and**

**continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an

14

equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Hixson made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2011.

2. Plaintiff has not engaged in substantial gainful activity since her alleged onset date of June 1, 2006.

3. Plaintiff has the following severe impairments: status/post right acetabular fracture, status/post right ankle fracture; seizure disorder, and degenerative disc disease of the lumbar spine.

6. Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7. Plaintiff has the residual functional capacity to perform light work with the following restrictions: (1) can lift and carry twenty pounds occasionally; (2) can

15

lift and carry ten pounds frequently; (3) can stand and walk for six hours during an eight-hour workday; (4) can sit for six hours during an eight-hour workday with a sit/stand option every hour; (5) can occasionally climb stairs and ramps with handrails, bend, balance, stoop, reach in all directions, handle, finger, and feel; (6) cannot kneel or crawl; and (7) must avoid vibration and hazardous conditions.

8.   Plaintiff is unable to perform any past relevant work.

9.   Plaintiff was born on July 31, 1957, and was 48 years old, which is defined as a younger individual, on the alleged onset date.

10.   Plaintiff has a limited education and is able to communicate in English.

11.   Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the Plaintiff is "not disabled" whether or not the Plaintiff has transferable job skills.

12.   Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.

13.   Plaintiff has not been under a disability, as defined in the Social Security Act, from June 1, 2006, through the date of the ALJ's decision.

(Docket No. 11, pp. 15-23 of 601). ALJ Hixson denied Plaintiff's request for DIB (Docket No. 11, p.

22 of 601).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner,* 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan,* 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

16

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges that the ALJ failed to: (1) reasonably assess her credibility; and (2) pose a reasonable hypothetical question to the VE (Docket No. 13).

### B.    DEFENDANT'S RESPONSE

Defendant disagrees and argues that substantial evidence supported the ALJ's finding that Plaintiff's subjective complaints of pain were not credible (Docket No. 14). Furthermore, Defendant also maintains that the ALJ included all relevant and reasonable restrictions in the hypothetical questions posed to the VE (Docket No. 14).

### C.    DISCUSSION

#### 1.    PLAINTIFF'S CREDIBILITY

Under Social Security regulations, a claimant's subjective complaints of pain or other symptoms are not, on their own, conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A). However, a claimant may experience pain severe enough to restrict his ability to work. In such cases,

an ALJ must evaluate the credibility of a claimant's allegations. Social Security Ruling 96-7p provides

the framework under which an ALJ must analyze a claimant's credibility. The Ruling states, in part:

> In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 SSR LEXIS 4, *2-4 (July 2, 1996). The ALJ's findings as to a claimant's credibility are entitled

to deference. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005). Here, ALJ

Hixson determined that, while Plaintiff's medically determinable impairments could reasonably be

expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence,

and limiting effects of these symptoms were not credible (Docket No. 11, p. 19 of 601). ALJ Hixson

did not totally discount Plaintiff's somewhat decreased ability: she limited Plaintiff to only light work

with additional restrictions (Docket No. 11, p. 18 of 601). A review of Plaintiff's medical record

supports this conclusion.

Plaintiff testified that she could lift and carry approximately ten pounds (or a gallon of milk),

stand for three to four minutes before becoming uncomfortable, and walk two hundred feet before

breaking out in a "hot sweat and [her] heart is racing" (Docket No. 11, pp. 44-45 of 601). Plaintiff also

18

stated that she has to shift from side to side while sitting, and cannot reach overhead cabinets, bend from the waist, or kneel (Docket No. 11, p. 45 of 601). Plaintiff did indicate that she could crawl, if someone helped her down to the floor (Docket No. 11, pp. 45-46 of 601). Plaintiff testified that she cannot go up or down stairs without using the railing due to her hip pain, and cannot stand up straight some mornings because of her back pain and spasms (Docket No. 11, pp. 40, 43 of 601). Plaintiff's medical records paint a slightly different picture.

First, despite her alleged difficulty standing and walking, Plaintiff stated that she does not use any assistive devices, such as a cane (Docket No. 11, p. 40 of 601). Plaintiff's hip injury and subsequent surgery occurred in June and July 2004 (Docket No. 11, p. 193 of 601). By May 2005, Plaintiff had been advised that she could return to work part-time (Docket No. 11, p. 209 of 601). The next mention of Plaintiff's back or hip pain does not occur until more than three years later, when Plaintiff presented to the MetroHealth ER on November 14, 2008, complaining of back pain after she lifted a cooler filled with ice (Docket No. 11, pp. 423, 440 of 601). Although an MRI showed advanced degenerative disc disease at the L4-5 vertebrae, Plaintiff had only mild superior endplate deformities and marrow edema (Docket No. 11, p. 500 of 601). Plaintiff was not placed under any restrictions.

Plaintiff also underwent surgery to correct her ankle fracture in March 2007 (Docket No. 11, p. 218 of 601). By May 2007, there was no remaining evidence of a fracture and Plaintiff was released to return to sit-down work, and even standing work as tolerated (Docket No. 11, p. 303 of 601). Plaintiff continued to complain of right leg pain, but scans showed no abnormality (Docket No. 11, p. 233 of 601). In June 2007, Plaintiff was advised to wear compression stockings on both legs, given the edema that had formed (Docket No. 11, p. 244 of 601). However, Plaintiff admitted that she did not begin

19

wearing the stockings until November 2008 (Docket No. 11, p. 448 of 601). During an April 13, 2008, visit with Dr. Vijayan, Plaintiff stated that she had only "occasional discomfort" in her right leg (Docket No. 11, p. 380 of 601). During a December 5, 2008, physical therapy appointment, Plaintiff reported having no pain in her right leg (Docket No. 11, p. 448 of 601).

State examiner Dr. Gahman determined that, based on Plaintiff's medical records, Plaintiff had no manipulative, visual, or communicative limitations and could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; (5) engage in unlimited pushing and pulling; and (6) occasionally kneel (Docket No. 11, pp. 277-80 of 601). Given its consistency with the balance of the medical evidence, ALJ Hixson gave Dr. Gahman's opinion considerable weight (Docket No. 11, p. 21 of 601). Based on the Magistrate's examination of the record and the above analysis, there is substantial evidence to support the assignment of such weight.

Plaintiff also testified that she experiences seizures every two to three months (Docket No. 11, p. 41 of 601). Plaintiff was diagnosed with complex partial seizures on December 7, 2004 (Docket No. 11, p. 275 of 601). She was started on the anti-epileptic drug Phenytoin to control these seizures (Docket No. 11, p. 275 of 601). In a November 13, 2007, evaluation submitted by Plaintiff's own neurologist Dr. Richardson to the BDD, Dr. Richardson indicated that Plaintiff's seizures were adequately controlled with the medication (Docket No. 11, p. 269-70 of 601). In fact, Dr. Richardson opined that Plaintiff had no limitations (Docket No. 11, p. 270 of 601). On April 4, 2007, Plaintiff presented to the MetroHealth ER with a seizure (Docket No. 11, p. 222 of 601). Plaintiff admitted that she had missed at least one dosage of medication (Docket No. 11, p. 222 of 601). She also stated that,

20

prior to this incident, she had not had a seizure for one year (Docket No. 11, p. 222 of 601). Plaintiff's

next documented seizure occurred on September 12, 2007, while she was waiting to be seen in

MetroHealth's Orthopedic Clinic (Docket No. 11, p. 248 of 601). Once transported to the ER, Plaintiff

checked herself out against medical advice, claiming she had been waiting too long (Docket No. 11, p.

256 of 601). Notes from that same visit indicate that Plaintiff altered the dosage of her seizure

medication on her own (Docket No. 11, p. 257 of 601). Although Plaintiff testified that her last episode

of medication non-compliance occurred "a few years back," medical records show that she was non-

compliant as recent as May 2009, when she experienced a seizure due to a failure to take her

medication (Docket No. 11, p. 515 of 601). Furthermore, although Plaintiff stated that she experiences

seizures every two to three months (Docket No. 11, p. 41 of 601), medical records show that Plaintiff

had periods where she went at least one year without a seizure (Docket No. 11, p. 222 of 601).

Based on a review of the record, the Magistrate finds that there is substantial evidence to

support the ALJ's assessment of Plaintiff's credibility. Therefore, Plaintiff's first assignment of error is

without merit and the Magistrate recommends that the decision of the Commissioner be affirmed.

### 2.    HYPOTHETICAL QUESTION

Plaintiff next alleges that the ALJ failed to pose a hypothetical question based on the

substantial evidence contained in the record (Docket No. 13, pp. 15-18 of 18). Specifically, Plaintiff

alleges that the ALJ's failure to properly assess Plaintiff's credibility led the ALJ to pose an

unreasonable hypothetical question to the VE, one that did not fully encompass all of Plaintiff's actual

limitations (Docket No. 13, pp. 15-18 of 18).

In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be

based on a hypothetical question which accurately portrays the claimant's physical and mental

impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

However, it is also "well established that an ALJ . . . is required to incorporate only those limitations

accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health &*

*Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, ALJ Hixson's initial hypothetical questions restricted Plaintiff to light work and posed a

number of additional limitations, including an hourly sit/stand option (Docket No. 11, p. 18 of 601).

VE Salkin testified that, while Plaintiff would not be able to return to her past work given these

limitations, there were a number of other jobs that she could perform, including watch guard, vending

attendant, and office helper (Docket No. 11, p. 56 of 601). The VE indicated that his testimony was

consistent with the DOT except with regard to the sit/stand option, which is not considered by the

DOT and for which the VE had to draw upon his own experience in the field (Docket No. 11, p. 56 of

601).

Plaintiff first argues that, at step five of the sequential evaluation, the ALJ should have assessed

whether there existed other jobs which Plaintiff could perform *solely* using the Medical Vocational

Guidelines, more commonly known as "the Grid" (Docket No. 13, p. 16 of 18). According to Plaintiff,

"[i]t is clear that as of her application date, [Plaintiff] would fit within [the Grid] and would 'grid out'

at sedentary" (Docket No. 13, p. 16 of 18). The Grid is a tool utilized by the Commissioner "in

determining disability claims by allowing administrative notice to be taken of the existence of jobs in

the national economy that those with particular combinations of the four statutory factors are capable

of performing. The grid is composed of rules . . . each of which specifies whether a claimant with a

particular combination of the four factors listed in the Act . . . will be found disabled or not disabled."

*Abbott*, 905 F.2d at 926.

22

A claimant cannot "grid out" at sedentary. Rather, a claimant can be found capable of only sedentary work using residual functional capacity guidelines and her case may then be analyzed under the Grid applicable to a sedentary residual functional capacity to determine if she is disabled.

In her brief, Plaintiff seems to argue that she is capable of only sedentary work, given her weight and inability to engage in extended standing or walking (Docket No. 13, p. 16 of 18). This argument is without merit. Plaintiff cited her biggest obstacle in returning to work as being the numbness in her right foot (Docket No. 11, p. 40 of 601). Plaintiff argues that her "weight, her once broken ankle and the swollen right leg limit her ability to stand. There is no evidence that she can stand any more than she said she could" (Docket No. 13, p. 14 of 18), which is three to four minutes (Docket No. 11, pp. 44-45 of 601). However, medical records do not support Plaintiff's conclusion.

Plaintiff uses no assistive device to stand or walk (Docket No. 11, p. 40 of 601). Plaintiff's ankle fracture was fully corrected through surgery in March 2007 (Docket No. 11, p. 218 of 601). Subsequent tests show no evidence of any abnormality (Docket No. 11, p. 233 of 601). In April 2008, Plaintiff reported having only "occasional discomfort" in her right leg (Docket No. 11, p. 380 of 601), and in December 2008, Plaintiff reported having no pain at all (Docket No. 11, p. 448 of 601). State examiner Dr. Gahman reviewed all of Plaintiff's medical records and found Plaintiff capable of standing for six hours out of an eight-hour workday (Docket No. 11, p. 277 of 601). Even while having pain, Plaintiff never rated it more than a five out of a possible ten (Docket No. 11, p. 232 of 601). Although Plaintiff was diagnosed with edema in her right leg (Docket No. 11, p. 346 of 601), nowhere in the record is she given a limitation due to this impairment (Docket No. 11, pp. 186-601 of 601).

Plaintiff also argues that her weight plays a role in her residual functional capacity (Docket No.

13, p. 14 of 18). ALJ Hixson considered Plaintiff's morbid obesity in rendering her decision, but ultimately found that obesity, considered individually and in combination with Plaintiff's other impairments, did not meet or medically equal a listing (Docket No. 11, p. 18 of 601). Plaintiff did not argue that this finding was in error. Nor did counsel include, during cross-examination, Plaintiff's weight and its implications in a hypothetical question to the VE during cross-examination (Docket No. 11, pp. 50-59 of 601). Therefore, she cannot now rely on her weight in an effort to determine her work level capability.

Furthermore, even *if* Plaintiff were found to be capable of only sedentary work, analysis under the Grid alone is inappropriate. The ALJ determined that Plaintiff had both exertional and nonexertional impairments (Docket No. 11, pp. 17-18 of 601). A limitation is classified as exertional if it affects a claimant's "ability to meet the strength demands of the jobs." 20 C.F.R. § 1569a(a). "Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." 20 C.F.R. § 404.1569a(a). This includes limitations involving the ability to "reach; to seize, hold, grasp, or turn an object (handle); to bend the legs alone (kneel); to bend the spine alone (stoop) or bend both the spine and legs (crouch)." 1985 SSR LEXIS 20, *5. Non-exertional limitations also include fine movements of small objects, or those that require the use of fingers to pick or pinch, and any impairment of vision, speech, or hearing. *Id*. at *6.

Plaintiff's exertional limitations include: (1) lifting and carrying twenty pounds occasionally; (2) lifting and carrying ten pounds frequently; (3) standing and walking for six hours during an eight-hour workday; (4) sitting for six hours during an eight-hour workday; and (5) a sit/stand option every hour (Docket No. 11, p. 18 of 601). Plaintiff's nonexertional limitations include: (1) only occasionally

24

climbing stairs and ramps with handrails; (2) only occasionally bending, balancing, stooping, reaching

in all directions, handling, fingering, and feeling; (3) never kneeling or crawling; and (4) always

avoiding vibration and hazardous conditions (Docket No. 11, p. 18 of 601).

As a general rule, an ALJ "may not rely on the grids alone to meet [his] step-five burden where

the evidence shows that a claimant has nonexertional impairments that preclude the performance of a

full range of work at a given level." *Abbott*, 905 F.2d at 926-27. If the claimant suffers from *both*

exertional and non-exertional impairments, the Grid may be used only as a framework to provide

guidance for decision-making, not to direct a conclusion of disability. *Id.* "Rote application of the grid

is inappropriate." *Id*. at 926. An ALJ must therefore only treat the Grid as a framework in these cases

and "must rely on other evidence to determine whether a significant number of jobs exist in the

national economy that a claimant can perform."*Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th

Cir. 2008) (*citing Burton v. Sec'y of Health and Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990)).

This other evidence includes the testimony of a VE. *See Born v. Sec'y of Health and Human Servs.*,

923 F.2d 1168, 1174 (6th Cir. 1990).

Because Plaintiff suffers from both exertional and nonexertional limitations, simple application

of the Grid is inappropriate. Therefore, Plaintiff's allegation that, had Plaintiff "been limited to

sedentary work instead of light work, she would have been found disabled under the Grid Regulations"

(Docket No. 15, p. 2 of 3), is without merit. The ALJ was required to use the Grid only as a guideline

in determining whether Plaintiff was disabled. It is also worth mentioning that *even if* the ALJ could

have analyzed Plaintiff's case solely under the Grid, Plaintiff's conclusion that she would have been

found disabled is still incorrect. On the alleged disability onset date, Plaintiff was forty-eight years old,

which is defined as a younger individual age 18-49 (Docket No. 11, p. 21 of 601). Plaintiff completed

only eleventh grade, giving her a limited education (Docket No. 11, p. 21 of 601). The VE testified that Plaintiff's past work was both skilled and unskilled (Docket No. 11, pp. 52-53 of 601). Given these parameters, the Grid would find Plaintiff "not disabled." 20 C.F.R. Part 404, Subpart P, App. 2.

Finally, Plaintiff seems to take issue with the fact that Plaintiff's counsel at the administrative hearing failed, essentially, to make Plaintiff's case (Docket No. 13, pp. 16-18 of 18). The law entitles a claimant to representation by an attorney or other representative at the administrative hearing and in other proceedings relating to a Social Security disability case. 42 U.S.C. § 406(a)(1). However, the "Supreme Court has *never* recognized a *constitutional* right to counsel at an SSA hearing." *Brandyburg v. Sullivan*, 959 F.2d 555, 562 (5th Cir. 1992) (emphasis added). While an ALJ has a special duty to develop a full and fair record where a claimant is proceeding without counsel (*Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983)), the same cannot be said of a claimant who appears with counsel. "[F]ederal courts have rejected arguments by other social security claimants who allege ineffectiveness or malpractice by their counsel in the representation of a claimant." *Meadows v. Astrue*, 2012 U.S. Dist. LEXIS 151346, *13 (N.D. Ohio Sept. 25, 2012); *see also Hettinger v. Richardson*, 365 F.Supp. 1245, 1246 (E.D. Penn. Oct. 30, 1973) (holding that where a Social Security claimant was advised of her right to counsel and was in fact represented by counsel, that claimant could not later complain that the representation was inadequate).

Here, Plaintiff complains about the inadequacy of her hearing counsel (Docket No. 13, pp. 16-18 of 18). Specifically, Plaintiff alleges that hearing counsel failed to: (1) inquire into the VE's experience specifically as it related to the sit/stand option; (2) pose a hypothetical question that included a sedentary limitation; and (3) challenge the ability of a three hundred-pound woman to do the jobs identified by the VE (Docket No. 13, p. 16 of 18). This argument, based on the law set forth

26

above, is without merit. Furthermore, although Plaintiff alleges that her hearing counsel failed to pose a hypothetical question that included a sedentary work level, the ALJ *did* pose such a question, asking whether "if a person were only lifting and carrying [ten] pounds occasionally and only standing and walking for two hours and sitting for six, would that be considered a sedentary position?" (Docket No. 11, p. 56 of 601).

Therefore, Plaintiff's second assignment of error is without merit and the Magistrate recommends that the decision of the Commissioner be affirmed.

### VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  May 10, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.